[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an appeal from a decision of the Family Court Magistrate.
For the purpose of clarity, this court will set forth the facts and history of this case. In 1980 the plaintiff, Deborah Peterson, gave birth to a child, Dylan R. Peterson, in North Carolina. The defendant, Gary Israel, who currently resides in Connecticut, worked in North Carolina at the time. The plaintiff, however, moved to Michigan and instituted a paternity action against the defendant in CT Page 9233 1985. The defendant appeared through counsel in the Michigan case and moved for summary disposition seeking to have the case dismissed for lack of in personam jurisdiction.[1] The Circuit Court for the county of Oakland, state of Michigan, denied the motion finding that Michigan had personal jurisdiction over the defendant even though he never entered the state of Michigan for any purpose.
In 1993, the state of Connecticut initiated an action pursuant to General Statutes § 46b-180 et seq. That petition was dismissed by Magistrate Steele on procedural grounds in 1994. Subsequently, the state of Michigan, pursuant to the Uniform Reciprocal Enforcement of Support Act (URESA), filed a second action on behalf of the plaintiff Deborah Peterson. On September 12, 1997, Family Support Magistrate Steele denied the petition and refused to enforce the Michigan support orders in accordance with28 U.S.C. § 1738B, the Full Faith and Credit for Child Support Orders Act (FFCCSOA).[2]
In between the first and second action, the defendant filed a "motion to vacate void judgment" in the state of Michigan. On October 8, 1996, Judge Kuhn, the judge who found Michigan had jurisdiction over the defendant, denied the motion to vacate.[3] On October 16, 1997, the Court of Appeals of the state of Michigan denied the defendant's appeal for lack of merit on the grounds presented.
Pursuant to General Statutes § 46b-231 (n), the state filed the present appeal on the grounds that the magistrate's decision "is in violation of federal statutory provisions, in excess of the statutory authority, affected by errors of law, clearly erroneous and an abuse of discretion." (Defendant's Appeal Petition, September 24, 1997.) The state seeks reversal of the magistrates decision and/or a finding that the magistrate should have recused himself as requested by motion dated April 29, 1996.[4]
 DISCUSSION
General Statutes § 46b-231 (n)(1) provides that "[a] person who is aggrieved by a final decision of a family support magistrate is entitled to judicial review by way of CT Page 9234 appeal under this section."
The test for determining whether a claimant is aggrieved by a particular decision is two-fold: (1) the party claiming to be aggrieved must have a specific, personal and legal interest in the subject matter of the decision, and (2) the party must show that this personal and legal interest has been specially and injuriously affected by the decision. Newman v. Newman, 235 Conn. 82,103, 663 A.2d 980 (1995). In Newman, supra, the court concluded "that, ordinarily, minor children will qualify as `aggrieved' by a trial court order that significantly diminishes or, as in this case, eliminates the amount of support payable for their benefit by the noncustodial parent." Id., 103. In the present case, the plaintiff is aggrieved for the purposes of this appeal because the magistrate's decision has the effect of eliminating the amount of support payable for the minor child's benefit denying the state full reimbursement for support paid on behalf of the child.
Furthermore, the decision of the magistrate constitutes a final judgment for the purposes of appeal. "The lack of final judgment is a threshold question that implicates the subject matter jurisdiction of [the] court."Walton v. New Hartford, 223 Conn. 155, 162 n. 9,612 A.2d 1153 (1992). A final judgment is one "(1) where the order or action terminates a separate and distinct proceeding, or (2) where the order or action so concludes the rights of the parties that further proceedings cannot affect them."State v. Curcio, 191 Conn. 27, 31, 463 A.2d 566 (1983). In the present case, the magistrate found that the Michigan judgment was invalid because Michigan did not have personal jurisdiction over the defendant and denied "the establishment of a support order under URESA." Peterson v.Israel, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. BS-284 F/95 (September 12, 1997, Steele, FSM). The magistrate found that the defendant had "no duty to support due to lack of due process personal jurisdiction to establish paternity." Id.
Accordingly, the magistrate's decision terminated a distinct proceeding and concluded the rights of the parties.
The procedural requirements for bringing the appeal CT Page 9235 have been fulfilled. "A statutory right of appeal may be taken advantage of only by strict compliance with the statutory provisions by which it is created." (Internal quotation marks omitted.) Raines v. Freedom of InformationCommission, 221 Conn. 482, 489, 604 A.2d 819 (1992). The appeal was filed in a timely manner, within fourteen days of the decision being appealed. Furthermore, counsel certified that service of the appeal upon counsel for the defendant was made in accordance with General Statutes §46b-231(n)(2) by certified mail. Transcripts were not requested and no additional evidence has been submitted.
General Statutes § 46b-231(n)(7) provides that the Superior Court may affirm the decision of the family support magistrate, remand it for further proceedings, or reverse or modify the decision. The Superior Court may reverse or modify a decision if "substantial rights of the appellant have been prejudiced because the decision of the family support magistrate is: (A) in violation of constitutional or statutory provisions (B) in excess of the statutory authority of the family support magistrate; (C) made upon unlawful procedure; (D) affected by other error of law; (E) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (F) arbitrary or capricious or characterized by an abuse of discretion or clearly unwarranted exercise of discretion."
The state of Connecticut initiated an action pursuant to General Statutes § 46b-180 et seq., the Uniform Reciprocal Enforcement of Support Act (URESA).[5] That petition was dismissed by Magistrate Steele on procedural grounds in 1994. Subsequently, the state of Michigan, through the state of Connecticut and pursuant to URESA, filed a second action on behalf of the plaintiff Deborah Peterson. On September 12, 1997, Family Support Magistrate Steele denied the petition and refused to enforce the Michigan support orders in accordance with 28 U.S.C. § 1738B, the Full Faith and Credit for Child Support Orders Act (FFCCSOA).
The magistrate found that he had jurisdiction over the case and that is not in dispute. The issue as framed by the magistrate was "whether the FFCCSOA preemption of any provisions of URESA or our existing laws is constitutional." CT Page 9236 The magistrate relied on a recent decision on a similar issue in the case entitled Dalley v. Wineglass, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. BS-153 F/96 (February 12, 1997, Lifshitz, FSM). Additionally, the magistrate ruled that he could not employ the equitable doctrine of comity to recognize the Michigan action.
The parties memoranda in support of their respective positions raise several issues including: (1) whether the Michigan court's decision on jurisdiction is correct; (2) whether the court can give full faith and credit to a decision that is modifiable and thus not a final judgment; (3) whether the FFCCSOA is constitutional under the commerce clause or the tenth amendment of the U.S. constitution; (4) whether the FFCCSOA preempts state law; and (5) whether the FFCCSOA is applicable to the present case.
 I. Jurisdiction
Michigan's long arm statute at the time of the decision, MCL 600.705(2), provided in relevant part: "The existence of any of the following relationships between an individual or his agent and the State shall constitute a sufficient basis of jurisdiction to enable a court of record of this State to exercise limited personal jurisdiction over the individual and to enable the court to render personal judgments against the individual or his representative arising out of an act which creates any of the following relationships: (2) The doing or causing an act to be done, or consequences to occur in the state resulting in an action for tort." Peterson v. Israel, Michigan Circuit Court for the county of Oakland, No. 85 288430 DP (Kuhn, J., August 9, 1985). The Circuit Court opined that "[i]n Michigan, the concept of minimum contacts' with the forum state, regarding paternity actions, has been well settled by finding that an `action in tort' [MCL 600.705(2)] includes statutory causes of action such as breach of a non-contractual legal duty, under the paternity Act, MCL 722.11 et seq." Id. Relying on the precedent set forth in Black v. Rasile, 113 Mich. App. 601,603 (1980), the Circuit Court found it had personal jurisdiction over the defendant, Gary Israel. The Circuit Court cited the holding of Black v. Rasile as follows: "[The statutory cause of action is not triggered CT Page 9237 by the father's participation in the act of conception but by his subsequent failure or refusal to pay the costs ofconfinement and birth, and the necessary support of thechild. MCL 722.712(a)." (Emphasis added.) Peterson v.Israel, supra, Michigan Circuit Court for the county of Oakland, No. 85288430DP, quoting Black v. Rasile, supra, 604.
Judge Kuhn found, "as a matter of law, that Defendant [was] subject to the jurisdiction of [the Michigan] court because of Defendant's failure to pay the enumerated costs and the child's support [was] thus, the tortious act which occurs within [Michigan]." Peterson v. Israel, supra. Judge Kuhn denied the defendant's motion for summary disposition. The defendant did not appeal Judge Kuhn's decision.
In 1986 Judge Kuhn found that the defendant, who failed to appear "despite notice", was the father of Dylan R. Peterson and ordered the defendant to pay $40 per week for the support and education of Dylan R. Peterson and $20 per week toward the arrearage that had accumulated since the child's birth, March 30, 1980. Judge Kuhn also ordered the defendant to pay the costs associated with the child's birth and pay all medical expenses incurred for and on behalf of the minor child.
The defendant argues that the FFCCSOA, "like URESA, recognizes that this state is not required to enforce a judgment of another state which was entered without personal jurisdiction. The FFCCSOA requires states to enforce child support orders `made consistently with' the Act. 28 U.S.C. § 1738B (a) . . . Accordingly, a crucial issue is whether the Michigan court's exercise of personal jurisdiction over the [defendant] was consistent with constitutional due process requirements." (Defendant's Memorandum dated January 30, 1998.) The law from the United States Supreme Court and the Connecticut Supreme Court dictates the following: "As a matter of federal law, the full faith and credit clause requires a state court to accord to the judgment of another state the same credit, validity and effect as the state that rendered the judgment would give it. Underwriters National Assurance Co. v.North Carolina Life Accident Health Ins. GuarantyAssn., 455 U.S. 691, 704, 102 S.Ct. 1357, 71 L.Ed.2d 558
CT Page 9238 (1982). This rule includes the proposition that lack of jurisdiction renders a foreign judgment void. Id., 704-705; see Nevada v. Hall, 440 U.S. 410, 421, 99 S.Ct. 1182,59 L.Ed.2d 416, reh. denied, 441 U.S. 917, 99 S.Ct. 2018,60 L.Ed.2d 389 (1979); Thompson v. Whitman, 85 U.S. (18 Wall.) 457, 469, 21 L.Ed. 897 (1874). A party can therefore defend against the enforcement of a foreign judgment on the ground that the court that rendered the judgment lacked personal jurisdiction, unless the jurisdictional issue was fullylitigated before the rendering court or the defending party waived the right to litigate the issue. UnderwritersNational Assurance Co. v. North Carolina Life Accident Health Ins. Guaranty Assn., supra, 706; Sherrer v. Sherrer,334 U.S. 343, 350-52, 68 S.Ct. 1087, 92 L.Ed. 1429 (1948);Williams v. North Carolina, 325 U.S. 226, 229-30, 233,65 S.Ct. 1092, 89 L.Ed. 1577, reh. denied, 325 U.S. 895,65 S.Ct. 1560, 89 L.Ed. 2006 (1945); Morabito v. Wachsman,191 Conn. 92, 96-99, 463 A.2d 593 (1983); 2 Restatement (Second), Judgments 81, comment (a) (1982); 1 Restatement (Second), Conflict of Laws 96 (1971)." (Emphasis added.)Packer Plastics, Inc. v. Laundon, 214 Conn. 52, 56-7,570 A.2d 687 (1990).
"The full faith and credit clause, article IV, § 1 of the United States constitution, requires that judgments of the courts of each state be given the same faith, credit, and effect in sister states as they have by law or custom in the courts of the state rendering them. Durfee v. Duke,375 U.S. 106, 109, 84 S.Ct. 242, 11 L.Ed.2d 186 (1963);Williams v. North Carolina, 325 U.S. 226, 228,65 S.Ct. 1092, 89 L.Ed. 1577 (1945); Milliken v. Meyer,311 U.S. 457, 462, 61 S.Ct. 339, 85 L.Ed. 278 (1940); Stoll v.Gottlieb, 305 U.S. 165, 170, 59 S.Ct. 134, 83 L.Ed. 104
(1938); Milwaukee County v. M. E. White Co., 296 U.S. 268,273, 56 S.Ct. 229, 80 L.Ed. 220 (1935); Roche v. McDonald,275 U.S. 449, 451, 48 S.Ct. 142, 72 L.Ed. 365 (1928). The United States Supreme Court has stated that recovery upon a judgment may be resisted if the court that rendered it was without jurisdiction. Milwaukee County v. M. E. WhiteCo., supra, 275." Morabito v. Wachsman, 191 Conn. 92,96-97, 463 A.2d 593 (1983). The defendant argues that the Michigan judgment is not valid because Michigan lacked jurisdiction over him in the original proceedings. The defendant, however, has already had an opportunity for a full hearing on this precise issue in the courts of CT Page 9239 Michigan. Id.
"When a defendant appears in an action to object that the court has no jurisdiction over him and the court overrules the objection and renders judgment against him, the local law of the State where the judgment was rendered determines, subject to constitutional limitations, whether the parties are precluded from attacking the judgment collaterally on the ground that the court had no jurisdiction over the defendant. 1 Restatement (Second), Conflicts 96. In conformity with this view, [the court will] look to [Michigan] law to determine whether the defendant, having already litigated in [Michigan] the question of [Michigan's] jurisdiction over him, may now collaterally attack the judgment on the basis of jurisdiction." Morabito v. Wachsman, supra, 191 Conn. 97.
"It seems to be the law of Michigan that one who appears specially for the purpose of objecting to the court's jurisdiction is precluded, after an adverse ruling, from collaterally attacking a judgment on the ground that the court had no jurisdiction over the defendant." Henockv. Yeamans, 340 F.2d 503, 505 (5th Cir. 1965).
The defendant was not without recourse after the decision adverse to him was rendered. He could have directly appealed to the Michigan Appellate Court pursuant to MCR 7.203 or he could have filed a motion to vacate void order in a timely fashion pursuant to MCR 2.612(C)(1) (d). He chose instead to take no further action. Therefore, the 1980 decision remains conclusive on the question of Michigan's jurisdiction over the defendant. "If the defendant appears in an action for the purpose of contending that the court has no jurisdiction over him, he thereby submits to the court for its determination the question whether the court has jurisdiction over him. If the court erroneously determines that it has jurisdiction over the defendant, he has ground for reversal in an appellate court and . . . ground for carrying the case to the Supreme Court of the United States. If, however, the defendant does not appeal, or if the judgment is affirmed, or if the appellate court or the Supreme Court of the United States declines to consider the case, the defendant has no constitutional right thereafter to contend that the judgment was void, even though in fact the court did not CT Page 9240 originally have jurisdiction over him. 1 Restatement (Second), Conflicts 96, comment b." Morabito v. Wachsman,supra, 191 Conn. 103 n. 4.
The defendants "argument again assumes that there is something unique about the requirement of personal jurisdiction which prevents it from being established or waived like other rights. A defendant is always free to ignore the judicial proceedings, risk a default judgment, and then challenge that judgment on jurisdictional grounds in a collateral proceeding. See Baldwin v. Traveling Men'sAssn., 283 U.S. 522, 525 (1931). By submitting to the jurisdiction of the court for the limited purpose of challenging jurisdiction, the defendant agrees to abide by that court's determination on the issue of jurisdiction: That decision will be res judicata on that issue in any further proceedings. Id., at 524; American Surety Co. v.Baldwin, 287 U.S. 156, 166 (1932)." Insurance Corp. ofIreland v. Compagnie Des Bauxites Guinee, 456 U.S. 694,706-07, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982).
The court recognizes that the Michigan court did not analyze whether the defendant had the required "minimum contacts" with the state and thus due process was lacking. Even Michigan repudiated their law and ruled that "the Black Court did not consider the due process requirements which must be present before a Michigan court may properly exercise personal jurisdiction." Rainsberger v. McFadden,174 Mich. App. 660, 436 N.W.2d 412, 415 (1989). The defendant in the present case, however, appeared to defend the issue of jurisdiction but did not appeal the Michigan court's decision. As previously stated, in between the first and second Connecticut action, the defendant filed a "motion to vacate void judgment" in the state of Michigan. On October 8, 1996, Judge Kuhn, the judge who found Michigan had jurisdiction over the defendant, denied the motion to vacate.[6] On October 16, 1997, the Court of Appeals of the state of Michigan denied the defendant's appeal for lack of merit on the grounds presented. This court is bound by the precedent set forth above. The magistrate found that the Michigan court's decision lacked due process and as such would not be accorded comity. The magistrate's finding that the Michigan court lacked jurisdiction is reversed. CT Page 9241
 II. Full Faith and Credit Under Article IV § 1 of The United States Constitution
The defendant argues that "[t]he judgment rendered in one state is entitled to full faith and credit only if it is a final judgment, and the judgment is final only if it is not subject to modification in the state in which it was rendered." Hendrix v. Hendrix, 160 Conn. 98, 104,273 A.2d 890 (1970). "`Limiting appeals to judgments that are final serves the important public policy of minimizing interference with and delay in the resolution of trial court proceedings.' Madigan v. Madigan, 224 Conn. 749,752-53, 620 A.2d 1276 (1993)." White v. White,42 Conn. App. 747, 749, 680 A.2d 1368 (1996). The defendant's interpretation of this language would mean that any child support or alimony order rendered in this jurisdiction or any other jurisdiction would never be given recognition regardless of any changes that occurred in the lives of the litigants. This argument is without merit.
"Although strict finality is strongly favored, there are certain situations that demand a flexible approach allowing for modifications. Two examples of such situations are custody and family maintenance actions, and workers' compensation awards. The statutory framework in each of these areas permits final awards to be modified in a subsequent action when certain criteria are satisfied. In the family law context, alimony and support awards and child custody and visitation orders are subject to modification but, nevertheless, are considered to be final appealable judgments. See General Statutes § 46b-86 (a) (permitting modification of alimony and support awards); General Statutes § 46b-56 (permitting modification of child custody and visitation awards)." Marone v. City ofWaterbury, 244 Conn. 1, 15 (1998). The court finds that the flexibility in the area of family law would also be applicable to giving another state's orders full faith and credit regardless of the fact that the orders are subject to modification.
Additionally, "our legislature, by enacting the Uniform Reciprocal Enforcement of Support Act, expressed its intention that Connecticut courts recognize and enforce foreign alimony and support decrees regardless of whether they are modifiable." Walzer v. Walzer, 173 Conn. 62, 72, CT Page 9242 376 A.2d 62 (1977).
 III. Constitutionality of the Full Faith and Credit for Child Support Orders Act.
On appeal, the defendant argues that Congress in adopting the FFCCSOA exceeded the scope of the commerce clause by attempting to regulate activity that is not commerce and that does not "substantially affect" interstate commerce. The defendant argues that this court should follow the ruling of Dalley v. Wineglass, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. BS-153F/96 (February 12, 1997, Lifshitz, FSM) (3 Conn. Ops. 301).[7] The magistrate in the present case agreed with the ruling in Dalley wherein the court was not persuaded that the Commerce Clause provides justification for federal preemption of present Connecticut law and procedures regarding `standard' URESA petitions.'"Dalley v. Wineglass, supra. Furthermore, according to theDalley court, the Full Faith and Credit for Child Support Orders Act (FFCCSOA) was beyond the power granted the Congress and thus violated the commerce clause. The Dalley
court also as found that the FFCCSOA violated thetenth amendment and the full faith and credit clause[8] (article IV § 1) of the United States constitution. The court respectively disagrees with the reasoning or holding inDalley.
Both parties raise the issue of whether the FFCCSOA is constitutional under either the commerce clause or thetenth amendment.
 A. Commerce Clause
The plaintiff argues that Congress has the power to regulate how states enforce interstate support cases. The defendant on the other hand argues that Congress exceeded its authority under the commerce clause when it enacted the FFCCSOA. Research did not reveal any Connecticut Appellate or Supreme Court authority to support or refute either the plaintiff's or defendant's argument. Several cases from other jurisdictions at either the appellate or supreme court level, however, have found that the act was constitutional.[9] For example, in Kilroy v. Superior Court(Winter), 63 Cal.Rptr.2d 390, 399, 54 Cal.App.4th 793
CT Page 9243 (Cal.App. 2 Dist. 1997), the court, after a thorough analysis, concluded that the FFCCSOA "aimed at a growing problem involving enormous sums of money and multi-state governmental activities directed at recovering unpaid support solely in interstate cases substantially affects commerce between the various states." Id., 402.
In Kilroy, supra, the plaintiff argued that the FFCCSOA was unconstitutional because "it cannot be sustained as a congressional regulation of interstate commerce and it [was] an improper federal command to state government." Id., 399. The plaintiff in Kilroy citedUnited States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624,131 L.Ed.2d 626 (1995),[10] arguing "that the Full Faith and Credit for Child Support Orders Act cannot be sustained as a proper regulation of interstate commerce." Kilroy,supra, 399. The defendant in the present case presents essentially the same argument and relies on the Lopez case for the same reason.
The Kilroy court began its analysis with article I, § 8, clause 3 of the United States constitution which gives congress the authority "[t]o regulate commerce . . . among the several states . . ." The court then proceeded to articulate the standard of review in determining whether Congress exceeded its authority under the commerce clause. "We evaluate this claim under the traditional rationality standard of review as set forth by the U.S. Supreme Court and stated [w]e must defer to a congressional finding that a regulated activity affects interstate commerce if there is any rational basis for such a finding . . . and we must ensure only that the means selected by Congress are reasonably adapted to the end permitted by the Constitution. . .'" (Citations omitted; internal quotation marks omitted. ) Id., 399. "In Hodel v. Virginia SurfaceMining Recl. Assn. (1981) 452 U.S. 264, 277,101 S.Ct. 2352, 2360, 452 U.S. 264, the Supreme Court held, `Thus, when Congress has determined that an activity affects interstate commerce, the courts need inquire only whether the finding is rational.' (Accord, [Lopez], supra,514 U.S. at p. 557, 115 S.Ct. at p. 1629, 131 L.Ed.2d at p. 636.) A statute regulating `the burdens and benefits of economic life' is presumed to be a constitutional enactment under the Commerce Clause. FERC v. Mississippi (1982)456 U.S. 742, 754, 102 S.Ct. 2126, 2134, 72 L.Ed.2d 532, CT Page 9244 internal quotation marks omitted; Usery v. Turner ElkhornMining Co. (1976) 428 U.S. 1, 15, 96 S.Ct. 2882, 2892,49 L.Ed.2d 752.)." Kilroy, supra, 399.
In Lopez, supra, the court began its analysis with a discussion of Gibbons v. Ogden, 9 Wheat 1, 22 U.S. 1,6 L.Ed. 23 (1824), wherein the court stated that "[c]ommerce undoubtedly, is traffic, but it is something more: it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse." (Internal quotation marks omitted.) UnitedStates v. Lopez, supra, 514 U.S. 553. There are three broad categories of permissible regulation of interstate commerce. "First, Congress may regulate the use of the channels of interstate commerce. . . . [T]he authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has been frequently sustained, and is no longer open to question . . . Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. See, e.g., ShreveportRate Cases, 234 U.S. 342 (1914); Southern R. Co. v.United States, 222 U.S. 20 (1911) (upholding amendments to Safety Appliance Act as applied to vehicles used in intrastate commerce); Perez, supra, at 150 ([F]or example, the destruction of an aircraft (18 U.S.C. § 32), or thefts from interstate shipments (18 U.S.C. § 659). Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, Jones Laughlin Steel,301 U.S., at 37, i.e., those activities that substantially affect interstate commerce, Wirtz, supra, at 196, n. 27." (Citations omitted; internal quotation marks omitted.)United States v. Lopez, supra, 514 U.S. 558-59; Kilroy,supra, 63 Cal.Rptr.2d 399. The Lopez court concluded that "consistent with the great weight of our case law, . . the proper test requires an analysis of whether the regulated activity substantially affects' interstate commerce." United States v. Lopez, supra, 514 U.S. 559;Kilroy, supra, 63 Cal.Rptr.2d 400.
The conclusion of the California Appellate Court inKilroy, supra, 400, was that child support payments between CT Page 9245 parents living in two different states substantially affects interstate commerce. "To begin with, such regular transfers of money between residents for purposes of supporting children in different states involves interstate commerce. Utilizing the test set forth by Chief Justice Marshall in Gibbons v. Ogden, supra, 22 U.S. 189-190 and relied upon in [United States v. Lopez, supra,514 U.S. 553, 115 S.Ct. 1627, 131 L.Ed.2d 633, the monthly mailing of support checks over what could be an 18-year period before a minor reaches majority is not commerce, which is completely internal, which is carried on between man and man in a State, or between different parts of the same State, and which does not extend to or affect other States. . . . Further, [United States v. Lopez and Gibbons v.Ogden, supra,] describe the word "among" in the Commerce Clause as restricted to that commerce which concerns more States than one and does not involve exclusively internal commerce of a State." (Citations omitted; internal quotation marks omitted.) Kilroy, supra, 63 Cal.App.4th 400
. The Full Faith and Credit for Child Support Orders Act regulates interstate commerce." Id.
The Kilroy court continued its discussion by looking to the evidence which was available to Congress in enacting the FFCCSOA and discussing the genesis of the act which was the creation of an independent commission. "The purpose of the commission was as follows: In 1988, Congress created the U.S. Commission on Interstate Child Support to study the challenges presented by the enforcement and establishment of child support orders across state lines, and to recommend changes to address those challenges." Id.
The full statement of Congressional findings was as follows: (a) FINDINGS. — The Congress finds that — (1) there is a large and growing number of child support cases annually involving disputes between parents who reside in different States; (2) the laws by which the courts of different jurisdictions determine their authority to establish child support orders are not uniform; [P] (3) those laws, along with the limits imposed by the Federal system on the authority of each State to take certain actions outside its own boundaries — (A) encourage noncustodial parents to relocate outside the States where their children and the custodial parents reside to avoid the jurisdiction of the courts of such States, resulting in an increase in the amount of interstate travel and CT Page 9246 communication required to establish and collect on child support orders and a burden on custodial parents that is expensive, time consuming, and disruptive of occupations and commercial activity; (B) contribute to the pressing problem of relatively low levels of child support payments in interstate cases and to inequities in child support payments levels that are based solely on the noncustodial parent's choice of residence; (C) encourage a disregard of court orders resulting in massive arrearages nationwide; (D) allow noncustodial parents to avoid the payment of regularly scheduled child support payments for extensive periods of time, resulting in substantial hardship for the children for whom support is due and for their custodians; and (E) lead to the excessive relitigation of cases and to the establishment of conflicting orders by the courts of various jurisdictions, resulting in confusion, waste of judicial resources, disrespect for the courts, and a diminution of public confidence in the rule of law; and (4) among the results of the conditions described in this subsection are — (A) the failure of the courts of the States to give full faith and credit to the judicial proceedings of the other States; (B) the deprivation of rights of liberty and property without due process of law; (C) burdens on commerce among the States; and (D) harm to the welfare of children and their parents and other custodians. (Pub.L. 103-383 (Oct. 22, 1994) § 2(a),108 Stat. 4064.) A report prepared for the Senate Judiciary Committee analyzed the foregoing findings as follows: "Section 2 provides that the Congress finds that a large and growing number of child support cases involve disputes across state lines, and the laws by which courts determine their authority to establish and modify child support orders are not uniform. This lack of uniformity in interpreting child support orders, combined with the inability of States to take certain actions outside of its own boundaries, has led to a number of deficiencies in child support collection. Lack of uniformity among the States encourages noncustodial parents to relocate outside the States where their children and custodial parents reside, in order to avoid the jurisdiction of the courts of such States. The result is an expensive, time consuming, and disruptive burden on the child and the custodial parent. In addition, the lack of uniformity contributes to relatively low levels of child support payments in interstate cases, allows noncustodial parents to avoid CT Page 9247 payment of child support for extended periods of time, and contributes to a number of other problems within the court system, including an increase in litigation and the establishment of conflicting orders in various jurisdictions. Among the results of conditions described in this section are the deprivation of rights of liberties and property without due process of law, burdens on commerce among the States, and harm to the welfare of children and their parents or other custodians. (1994 U.S. Code Cong. Admin. News, at pp. 3261-3262.)" Kilroy,supra, 63 Cal.Rptr. 401 n. 6.
Both the plaintiff and defendant discuss the case ofUnited States v. Sage, 92 F.3d 101 (2nd Cir. 1996), cert. denied, 117 S.Ct. 784, 136 L.Ed.2d 727 (1997). The plaintiff urges this court to follow the reasoning and holding of the Sage
case. The defendant argues that Sage is distinguishable because it involved a statute, 18 U.S.C. § 228,[11]
which criminalized failure to pay child support. The defendant also relies on Dalley v. Wineglass, supra, Superior Court, judicial district of Hartford, in support of the proposition that Sage
is not applicable because the statute at issue in Sage
regulated the conduct of individuals whereas the FFCCSOA regulates the conduct of the states. In light of the Sage court's discussion of the commerce clause and tenth amendment, this court is not persuaded by the defendant's argument.
The Sage court opened its discussion of the commerce clause with an analysis of Gibbons v. Ogden, supra,22 U.S. 1 (1824), and found that the matter before the court involved issues that plainly met the definition of commerce first set out by Justice Marshall in Gibbons, supra. "As the Supreme Court said in United States v. South-EasternUnderwriters Ass'n, 322 U.S. 533, 552, 64 S.Ct. 1162, 1173
(1944), the power granted Congress by the Commerce Clause is `a positive power,' a power `to govern affairs which the individual states, with their limited territorial jurisdictions, are not fully capable of governing.' Exercising that positive power Congress has often passed legislation to help the States solve problems that defy local solution. See, e.g., Perez v. United States,402 U.S. 146, 150, 91 S.Ct. 1357, 1359 (1971) (legislative history of the Consumer Credit Protection Act,18 U.S.C. § 891 et seq., indicated that loansharking simply cannot be CT Page 9248 solved by the states alone); United States v. Sheridan,329 U.S. 379, 384, 67 S.Ct. 332, 335 (1946) (in adopting the National Stolen Property Act, 18 U.S.C. § 2314, Congress contemplated coming to the aid of the states in detecting and punishing criminals who make a successful get away and thus make the state's detecting and punitive processes impotent); United States v. Bishop, 66 F.3d 569,579 (3rd Cir.) (Congress found in considering the Anti Car Theft Act of 1992, 18 U.S.C. § 2119, that significant barriers to [state and local] enforcement had resulted in thieves escaping punishment), cert. denied,116 S.Ct. 681 (1995)." (Internal quotation marks omitted.)United States v. Sage, supra, 92 F.3d 105.
"[S]ending money to another State is commerce although the transaction does not concern the flow of anything more tangible than electrons and information. Id., 106. TheSage court also discussed and distinguished the case ofUnited States v. Lopez, supra, stating that in Lopez, "[t]he decision turned on whether the legislation, on its face regulating purely local activity, was within the Commerce Clause power on the theory that the activity 'substantially affected' interstate commerce . . . The Act does not purport to regulate purely local activity. It addresses an obligation to make payments in interstate commerce. It is true, as Sage points out, that no payments are "in" interstate commerce when a prosecution is commenced. But the transaction the parent is obligated to consummate is, for the reasons stated above, in interstate commerce. Thus the Act may fairly be considered a proper exercise of Congress's power under the second category because it regulates the flow of payments on unfulfilled child support orders where the child and obligated parent reside in separate States. We need not reach the question whether the Act may be upheld under the other two categories." United States v. Sage, supra, 92 F.3d 106-07.
"None of the concerns expressed in the Lopez opinion is at stake in this case Id. 107.
"To sustain the Act does not require a court to espouse reasoning that would enable Congress to regulate any activities that might lead to crime regardless of how tenuously they relate to interstate commerce, . . . or any CT Page 9249 activities Congress found to be related to the economic productivity of individual citizens: family law (including marriage, divorce, and child custody), for example, . . . id. As already stated, by its terms the Act provides a multi-state jurisdictional element. . . Because it presupposes an order of a State court imposing an obligation to pay money, the Act concerns transactions related to economic activity." Id.
"[N]othing about the Act threatens the existence or significance of the States or interferes with the exercise of their powers. . . . On the contrary the Act aims to help the States in their efforts, often unsuccessful, to enforce their child support decrees." Id. The purpose of the FFCCSOA is also to help the states in their efforts, which were often unsuccessful through existing uniform acts, to enforce child support decrees.
The discussion in United States v. Sage regarding legislative intent points out the similarities between the FFCCSOA and 18 U.S.C. § 228. Congress "had been concerned `by those thousands and thousands of delinquent parents who make a mockery of State law by fleeing across State lines to avoid enforcement actions by State courts and child support agencies.' 138 Cong. Rec. H7324, H7326 (daily ed. Aug. 4, 1992) (statement of Cong. Hyde). In support of the bill he said that `[t]oo often as soon as delinquent fathers move to new States, they seem to vanish as far as State enforcement agencies are concerned' because the State `mechanisms lose their effectiveness.' He assured the House that the bill's goal was `to strengthen, not to supplant, State enforcement.' Id." United States v. Sage,supra, 103-04.
"The House Committee on the Judiciary reported that in the United States in 1989 some $5 billion of the $16 billion in child support obligations went unpaid. H.R. Rep. No. 771, 102d Cong., 2d Sess. 5 (1992). Although this amount evidenced a widespread problem in the United States, the bill sought to affect only that fraction that was indisputably interstate, namely, those instances where the delinquent parent and the children lived in different States. Id. at 6." United States v. Sage, supra, 103-04.
"Congress did not regard it a trivial matter that so CT Page 9250 many parents seeking to evade State court orders deliberately took advantage of our system of separate States. of the $5 billion in unpaid support, one-third involved a father living apart from his children in another State. Id. at 5. More than half of the custodial parents in interstate cases received support payments only occasionally, seldom, or never. Id.
"Congress recognized that the States had not been indifferent to the plight of children in such cases. The States have made willful failure to pay child support a crime and have adopted the Uniform law providing for enforcement across State lines. But that law's complex and cumbersome procedures have made it largely ineffective. Id.
at 6. The House heard of `instance after instance where spouses, usually husbands, did not want to pay, went to another State, waited just until the legal process was able to catch up with [them], and then went to another State and started the procedure all over again.' 138 Cong. Rec. at H7325 (statement of Cong. Schumer).
"State officials reported to Congress that support orders in interstate cases remain the most difficult to enforce and that extradition procedures under the Uniform law `have utterly failed to bring to justice' the delinquent parents. H.R. Rep. No. 771 at 6.
"Mindful of the increasing poverty rate of families with children and an absent parent, and of the concomitant effect on the amounts required to supply public assistance, id. at 5, Congress adopted the bill to supplement State enforcement of an absent parent's obligation." UnitedStates v. Sage, supra, 92 F.3d 104.
The purposes of the FFCCSOA was are "(1) to facilitate the enforcement of child support orders among the States; (2) to discourage continuing interstate controversies over child support in the interest of greater financial stability and secure family relationships for the child; and (3) to avoid jurisdictional competition and conflict among the State courts in the establishment of child support orders." Pub.L. 103-383 (October 22, 1994) § 2,108 Stat. 4064. The legislative intent and purposes behind both 18 U.S.C. § 228 and 28 U.S.C. § 1738 B were quite similar and will hopefully ameliorate past problems of CT Page 9251 enforcement of child support orders across state lines.
This court agrees with the reasoning and holding ofKilroy, supra, and Sage, supra and finds that the Full Faith and Credit for Child Support Act does not violate of the authority of Congress under the Commerce Clause.
 B. Tenth Amendment
The defendant argues that the FFCCSOA is an attempt to regulate domestic relations and as such, violates thetenth amendment[12] because it invades areas of legislation historically reserved to the states particularly, the protection of family relations. In discussing 18 U.S.C. § 228
and its potential violation of the tenth amendment, theSage court stated: "the Act does not attempt to regulate domestic relations. The legal relationship within the Sage family was initially determined by a Massachusetts court, and that determination was expressed in a judgment adopted by several other State courts, a judgment the States were unable to enforce due to Sage's frequent moves. The Act does not authorize a federal court to revise the domestic relationship adjudicated by the State courts or to modify any part of a State court decree.
"This is not a case where federal legislation has commanded a State to provide benefits for a child, cf. NewYork v. United States, 505 U.S. 144, 112 S.Ct. 2408 (1992) (Congress may not direct States to provide for the disposal of radioactive waste), or compelled a State to enact and enforce a federal family program. Cf. Hodel v. VirginiaSurface Mining Reclamation Assn., Inc., 452 U.S. 264,288, 101 S.Ct. 2352, 2366 (1981) (federal mining legislation upheld because it did not "commandeer" the States to regulate mining).
The Act accepts the validity of the State court judgment and the family policies that judgment embodies. It seeks merely to implement those State policies when the parent and the child live in different States and the judgment has been willfully flouted.
The Tenth Amendment did not disable the United States from helping the States to enforce State court orders imposing obligations to make support payments interstate. CT Page 9252 No doubt, as Justice Kennedy said in his concurring opinion in Lopez, the Framers of the Constitution believed that `freedom was enhanced by the creation of two governments, not one.' 115 S.Ct. at 1638. The only freedom that would be enhanced by striking down the Act would be the freedom of Sage and those like him to evade their State obligations to support their children residing in a different State.United States v. Sage, supra, 92 F.3d 107.
"[T]o date during the past half-century, the United States Supreme Court has rejected Tenth Amendment claims in all but two situations. The court has sustained governmental entities' Tenth Amendment claims where the federal government requires a state to enact and enforce a congressionally mandated regulatory program. (New York v.United States, [505 U.S. 144, 176, 112 S.Ct. 2408,2428-2429, 120 L.Ed.2d (1992).] Also, the Supreme Court has invalidated a federal restriction contained in an ambiguous statute relating to the retention of state judges. (Gregory v. Ashcroft, [501 U.S. 452, 469-470,111 S.Ct. 2395, 2405-2406, 115 L.Ed.2d 410 (1991)]. Other than these two narrow situations, all Tenth Amendment claims have ultimately been rejected by the United States Supreme Court." Kilroy v. Superior Court (Winter), supra, 63 Cal.Rptr.2d 404.
The court in Kilroy, supra, found that the FFCCSOA did not violate the tenth amendment. Based on the reasoning and holding of both Kilroy, supra, and Sage, supra, this court finds that the act does not violate thetenth amendment.
 C. Preemption
"The Supremacy Clause[13] permitted the Congress to adopt the Full Faith and Credit for Child Support Orders Act. This is so even though 28 United States Code section 1738B preempts state court jurisdiction to modify interstate child support orders. In Gregory v. Ashcroft, supra,501 U.S. at p. 460, 111 S.Ct. at pp. 2400-2401, the court described the effect of the Supremacy Clause as follows: `The Federal Government holds a decided advantage in this delicate balance: the Supremacy Clause. U.S. Const., Art. VI, cl. 2. As long as it is acting within the powers granted it under the Constitution, Congress may impose its CT Page 9253 will on the States. Congress may legislate in areas traditionally regulated by the States. This is an extraordinary power in a federalist system. It is a power that we must assume Congress does not exercise lightly.' The federal Supreme Court has repeatedly relied on the Supremacy Clause to preempt state laws on a variety of subjects related to judicial proceedings. (Block v. NorthDakota, [461 U.S. 273, 288-89, 103 S.Ct. 1811, 1820-1821,75 L.Ed.2d 840 (1983) [Congressionally adopted statute of limitations binding on states pursuant to Supremacy Clause, the Tenth Amendment notwithstanding]; Fidelity Federal Sav.and Loan Assn. v. de la Cuesta (1982) 458 U.S. 141,150-159, 102 S.Ct. 3014, 3020-3026, 73 L.Ed.2d 664
[California courts must enforce due on sale clause because of regulation promulgated by Federal Home Loan Bank]; FERCv. Mississippi, supra, 456 U.S. at pp. 760-761,102 S.Ct. at pp. 2137-2138 [Supremacy Clause permits federal regulation of state public utility despiteTenth Amendment]; Testa v. Katt (1947) 330 U.S. 386, 389-393,67 S.Ct. 810, 812-814, 91 L.Ed. 967 [under Supremacy Clause, Rhode Island courts must enforce federally mandated price controls]; Hauenstein v. Lynham (1879) 100 U.S 483,488-491, 25 L.Ed. 628 [Virginia courts required by Supremacy Clause to enforce terms of Swiss-American treaty in probate case].) Because the statute at issue is unambiguous, the Supremacy Clause permitted Congress to regulate and preempt state court jurisdiction." Kilroy v.Superior Court (White), supra, 63 Cal.Rptr.2d 406.
"The forgoing Supremacy Clause considerations are more compelling given the fact that the Full Faith And Credit Clause has an enforcement provision. Article IV, section of the United States Constitution states: `Full Faith and Credit shall be given in each State to the public acts, records, and judicial proceedings of every other State. And the Congress may by general laws prescribe the manner in which such acts, records and proceedings shall be proved, and the effect thereof.' Congress has been expressly delegated the power to enact laws which set forth the effect of `judicial [p]roceedings of every other [s]tate.' (Migra v. Warren City School Dist. Bd. of Ed.
(1984) 465 U.S. 75, 80, fn. 4, 104 S.Ct. 892, 896, fn. 4,79 L.Ed.2d 56; Atchison, Topeka, Santa Fe Ry. v. Sowers
(1909) 213 U.S. 55, 64, 29 S.Ct. 397, 399-400,53 L.Ed. 695; Metcalf v. Watertown (1894) 153 U.S. 671, 676, 14 CT Page 9254 S.Ct. 947, 949-950, 38 L.Ed. 861; Matter of Cook (7th Cir. 1995) 49 F.3d 263, 266.) An example of the exercise of this power is the adoption of 28 United States Code sections 1738 and 1738A." Kilroy v. Superior Court(White), supra, 63 Cal.Rptr.2d 407.
"Congress adopted the Full Faith and Credit for Child Support Orders Act pursuant to its express power set forth in article IV, section 1 of the United States Constitution to enact legislation describing the effect of a state court judgment. The Full Faith and Credit for Child Support Orders Act must therefore be enforced in California [and Connecticut] courts by reason of the Supremacy and Full Faith and Credit Clauses." Id., 407. Based on the foregoing, the court concludes that URESA is preempted to the extent it may conflict with the FFCCSOA. (See Kilroy,supra, and cases cited in note 9 of this opinion.)
 IV. Applicability of the Full Faith and Credit for Child Support Order Act
The defendant argues that even if the FFCCSOA is constitutional, the act can not be applied to enforce the Michigan order because the order that the plaintiff seeks to enforce was entered in 1986 and the FFCCSOA was enacted in 1994, long after the child support order was entered. The defendant also posits the dilemma of two United States Supreme Court decisions that appear to be in conflict on the issue of retroactive application of a statute. The rules that appear to be in conflict are: (1) pursuant toBradley v. School Bd. of Richmond, 416 U.S. 696, 711,94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), a court must apply the law in effect at the time it renders its decision; and (2) pursuant to Bowen v. Georgetown Univ. Hospital,488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988), statutory retroactivity is not favored.
"[F]ederal courts have labored to reconcile two seemingly contradictory statements found in our decisions concerning the effect of intervening changes in the law. Each statement is framed as a generally applicable rule for interpreting statutes that do not specify their temporal reach. The first is the rule that a court is to apply the law in effect at the time it renders its decision, Bradley,416 U.S., at 711. The second is the axiom that CT Page 9255 [r]etroactivity is not favored in the law, and its interpretive corollary that congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result. Bowen, 488 U.S., at 208." Landgraf v. USI FilmProducts, 511 U.S. 244, 263-64, 118 S.Ct. 163,139 L.Ed.2d 107 (1994).
We begin by noting that there is no tension between the holdings in Bradley and Bowen, both of which were unanimous decisions. Relying on another unanimous decision — Thorpe v. Housing Authority of Durham, 393 U.S. 268
(1969) — we held in Bradley that a statute authorizing the award of attorney's fees to successful civil rights plaintiffs applied in a case that was pending on appeal at the time the statute was enacted. Bowen held that the Department of Health and Human Services lacked statutory authority to promulgate a rule requiring private hospitals to refund Medicare payments for services rendered before promulgation of the rule. Our opinion in Bowen did not purport to overrule Bradley or to limit its reach. In this light, we turn to the "apparent tension" between the two canons mindful of another canon of unquestionable vitality, the `maxim not to be disregarded that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used.' Cohens v.Virginia, 6 Wheat. 264, 399 (1821)." Landgraf v. USI FilmProducts, supra, 511 U.S. 264-65.
"The presumption against statutory retroactivity has consistently been explained by reference to the unfairness of imposing new burdens on persons after the fact." Id., 270.
"The largest category of cases in which we have applied the presumption against statutory retroactivity has involved new provisions affecting contractual or property rights, matters in which predictability and stability are of prime importance. The presumption has not, however, been limited to such cases. At issue in Chew Heong v.United States, 112 U.S. 536 (1884), for example, was a provision of the "Chinese Restriction Act" of 1882 barring Chinese laborers from reentering the United States without a certificate prepared when they exited this country. We held that the statute did not bar the reentry of a laborer CT Page 9256 who had left the United States before the certification requirement was promulgated. Justice Harlan's opinion for the Court observed that the law in effect before the 1882 enactment had accorded laborers a right to reenter without a certificate, and invoked the "uniformly" accepted rule against `giv[ing] to statutes a retrospective operation, whereby rights previously vested are injuriously affected, unless compelled to do so by language so clear and positive as to leave no room to doubt that such was the intention of the legislature.' Id., at 559." (Citations omitted; footnote omitted.) Landgraf v. USI File Products,511 U.S. 271-72.
"[A] court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary. [Bradley],416 U.S. 711." Landgraf v. USI File Products, 511 U.S. 244, 277.
The defendant argues that the conflict between Bowen,supra, and Bradley, supra, need not be resolved for present purposes "because retroactive application of the FFCCSOA would be forbidden under either decision." (Defendant's Memorandum p. 13.) Under Bowen, argues the defendant, "[i]t is clear that retroactivity is improper because nothing in the language of FFCCSOA requires it. Even ifBradley were to apply, however, this case is one in which manifest injustice would result from retroactive application of the statute and thus such application would be improper." (Defendant's Memorandum p. 13-4.)
The following three factors are taken into consideration in determining whether manifest injustice would result in retroactive application of a statute: "[1] the nature and identity of the parties, [2] the nature of their rights, and [3] the nature of the impact of the change in law upon those rights." Bradley v. RichmondSchool Board, supra, 416 U.S. 717. Under the second factor a court will determine if retroactive modification would deprive either party of a mature or unconditional right.Id., 720. The defendant argues that "[a]t the time the support order was entered, Michigan permitted the modification of accrued support arrearages . . . A Michigan statute requiring such support installments to be a final judgment, not subject to retroactive modification, was not CT Page 9257 enacted until 1987, years after the support order in this case was entered . . . Thus, the support order here is subject to modification under Michigan law." (Defendant's Memorandum p. 15.) Because the FFCCSOA does not allow a responding state to modify an order of child support, enforcement in this state, according to the defendant, would not allow the defendant the opportunity to reduce the arrearage. This argument lacks merit because the defendant has had at least twelve years (from the date the order was entered in 1986 to the present) to move for a modification of the arrearage but more importantly, there is no obstacle standing in the defendant's path for moving for modification in the originating state, Michigan. Almost all of the cases cited by this court in note 9 of this opinion, supra, involved motions to modify wherein the court instructed the party seeking modification to file a motion with the originating state or the state that has continuing, exclusive jurisdiction over the order.
The final factor considered in a Bradley, supra, analysis is the impact of the change in law upon the rights of the parties. The defendant argues that under a Michigan I support order, a party would be entitled to have a court consider the equities of his situation prior to enforcing an arrearage. Under the FFCCSOA the defendant can always file a motion with Michigan and if that state modifies the arrearage Connecticut would enforce it as directed by the amount Michigan determines is due.
For the foregoing reasons, the application of the FFCCSOA would not work a manifest injustice on the defendant.
The decision, of the family support magistrate dismissing the present action is reversed. The parties did not submit financial information to the court and thus the action is remanded to the Family Support Magistrate for a determination of the amount of the arrearage[14] and the amount the defendant should be required to pay based on his present financial status. The arrearage will then be collected through wage withholding.
BISHOP, J.